2007 ND 28

**McCROTHERS CORP. d/b/a Tree City Bar, and Luke Berger, d/b/a Silver Dollar Bar, Plaintiffs and Appellants,**

v.

**CITY OF MANDAN, Defendant and Appellee.**

**No. 20060127.**

Supreme Court of North Dakota.

Feb. 28, 2007.

Justin J. Vinje (argued) and Ralph A. Vinje (appeared), Vinje Law Firm, Bismarck, N.D., for plaintiffs and appellants.

Malcolm H. Brown, Malcolm H. Brown, P.C., Bismarck, N.D., for defendant and appellee.

VANDE WALLE, Chief Justice.

[¶1] McCrothers Corporation, doing business as the Tree City Bar, and Luke Berger, doing business as the Silver Dollar Bar, appealed from a summary judgment dismissing their actions challenging the constitutionality of Mandan city ordinances regulating exotic dancing and adult cabaret entertainment. We conclude the ordinances do not violate the free speech rights of McCrothers and Berger and did not cause an unconstitutional taking of their property without just compensation. We affirm.

I

[¶2] Since at least 1979, Mandan has prohibited "[a]ppearances, entertainment or performances of any type consisting of or containing any nude performer or nude dancer, or topless female dancer" in alcoholic beverage licensed premises. Mandan Code of Ordinances § 12–01–18(2)(d) (1994). In June 2003, the Mandan Board of City Commissioners adopted ordinances regulating exotic dancing patterned after ordinances this Court upheld more than 25 years ago in *Olson v. City of West Fargo*, 305 N.W.2d 821 (N.D.1981). Ordinance No. 961 amended the Mandan Code of Ordinances to prohibit alcoholic beverage licensees from hosting "entertainment for more than one day a week any given week without first having obtained a cabaret license ..." Ordinance No. 961 further provides:

5. No live performances are permitted on an alcoholic beverage licensed premise which contains any form of

dancing. Such prohibition on dancing does not include the incidental movement or choreography of singers or musicians which are made in connection with their singing or playing of a musical instrument, provided the dancing does not include the acts prohibited under this section. This restriction applies to all alcoholic beverage licensed premises whether or not they have a cabaret license.

"Live performances" are defined under Mandan Code of Ordinances § 12–01–18(1)(b) as "any person who for consideration, monetary or otherwise, performs in person on a licensed premises as a singer, musician, dancer, comedian, model or any other type of entertainer." Ordinance No. 961 prohibits live performances on alcoholic beverage licensed premises involving "the removal of clothing, garments or any other costume," and these restrictions apply to all alcoholic beverage licensed premises "whether or not they have a cabaret license."

[¶3] Ordinance No. 963, which created Chapter 21–10 of the Mandan Code of Ordinances, declares the purpose for regulating "adult entertainment establishments," defines "[a]dult cabaret entertainment," "[a]dult establishments," "[a]dult uses," and "[s]pecified sexual activities," and restricts the areas within the city in which the establishments may be located. Ordinance No. 963 also provided an amortization period of two years from June 27, 2003, for nonconforming uses to continue operations, and provides penalties for violations of the chapter.

[¶4] Ordinance No. 964 again declares the purposes for regulating adult entertainment establishments, sets forth additional findings, defines "[a]dult [e]ntertainment" and other terms, and details the

procedures for obtaining an "Adult Cabaret License." Ordinance No. 964 further outlines the standards of conduct for operation of the establishments and the procedures for suspension and revocation of licenses.

[¶ 5] McCrothers owns and operates the Tree City Bar and Berger owns and operates the Silver Dollar Bar. Both bars are retail on-sale alcoholic beverage businesses located adjacent to one another on Main Street in Mandan. For 14 and 22 years, respectively, the Tree City Bar and the Silver Dollar Bar offered entertainment in the form of exotic dancing, which is now defined by the Mandan city ordinances as adult entertainment. When a third party sought to open another adult entertainment establishment on Main Street, the City Commissioners took action to enact the ordinances. The district court described how the Mandan ordinances affected these bars:

> Although no evidence was offered as to the precise nature of the dancing entertainment that was offered at both the Silver Dollar Bar and the Tree City Bar, it appears it would be classified as adult entertainment. Thus, under these three ordinances, neither the Silver Dollar Bar nor the Tree City Bar can offer this adult entertainment and hold a retail alcoholic beverage license at the same time. And if they want to offer adult entertainment without alcoholic beverages, they must first obtain a cabaret license, and then they can only operate such a business in areas zoned MB, MC and MD Industrial, which would require the removal of their businesses from their current Main Street locations.

[¶ 6] In June 2005, McCrothers and Berger brought separate actions seeking to enjoin enforcement of the ordinances on the ground that application of the ordinances to them constituted a taking of their property in violation of N.D. Const. art. I, § 12, and the Fifth Amendment to the United States Constitution. The district court issued orders to show cause and temporary restraining orders pending hearings, and the parties stipulated to consolidate the actions. The court vacated the temporary injunction effective September 9, 2005. On October 4, 2005, the court granted a motion by McCrothers and Berger to amend their complaints to allege that the ordinances violated their rights to freedom of speech under the First Amendment to the United States Constitution. The parties filed cross-motions for summary judgment. Following a hearing on the motions, the district court dismissed the complaints, ruling that the Mandan ordinances did not violate the free speech rights of McCrothers and Berger and did not result in an unconstitutional taking of their property without just compensation.

II

[¶ 7] Summary judgment is a procedural device for the prompt resolution of a controversy on the merits without trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. *Leet v. City of Minot*, 2006 ND 191, ¶ 12, 721 N.W.2d 398. Whether the district court properly granted summary judgment is a question of law that we review de novo on the record. *State ex rel. N.D. Housing Fin. Agency v. Center Mut. Ins. Co.*, 2006 ND 175, ¶ 8, 720 N.W.2d 425. Summary judgment is appropriate if the issues in the case are such that the resolution of any factual disputes will not alter the result. *State ex rel. Stenehjem v. FreeEats.com, Inc.*, 2006 ND 84, ¶ 4, 712 N.W.2d 828.

[¶ 8] Throughout these proceedings, the parties have maintained that there are no disputed issues of material fact, and the

only issues to be resolved are questions of constitutional law.

## III

[¶ 9] McCrothers and Berger contend that Mandan Ordinance Nos. 961, 963, and 964 violate their First Amendment right to free speech.

## A

[¶ 10] Nude or semi-nude dancing is expressive conduct protected by the First Amendment. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000); *see also Olson*, 305 N.W.2d at 824. Nevertheless, expressive conduct protected by the First Amendment may be regulated. *Pap's A.M.*, at 289, 120 S.Ct. 1382. In analyzing the constitutionality of laws affecting expressive conduct, the Supreme Court has explained:

> To determine what level of scrutiny applies to the ordinance at issue here, we must decide "whether the State's regulation is related to the suppression of expression." *Texas v. Johnson*, 491 U.S. 397, 403, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); see also *United States v. O'Brien*, 391 U.S. [367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)]. If the governmental purpose in enacting the regulation is unrelated to the suppression of expression, then the regulation need only satisfy the "less stringent" standard from *O'Brien* for evaluating restrictions on symbolic speech. *Texas v. Johnson, supra,* at 403, 109 S.Ct. 2533; *United States v. O'Brien, supra,* at 377, 88 S.Ct. 1673. If the government interest is related to the content of the expression, however, then the regulation falls outside the scope of the *O'Brien* test and must be justified under a more demanding standard. *Texas v. Johnson, supra,* at 403, 109 S.Ct. 2533.

*Id.* McCrothers and Berger argue the Mandan ordinances should be subject to strict judicial scrutiny because they focus on suppressing the content of speech.

[¶ 11] McCrothers and Berger rely on the Eighth Circuit Court of Appeals' decision in *Avalon Cinema Corp. v. Thompson*, 667 F.2d 659 (8th Cir.1981) (en banc), to support their argument. In *Avalon*, at 660, the plaintiff obtained building permits to construct a movie theatre and bookstore in a commercial-zoned area of North Little Rock, Arkansas, and planned to show sexually-oriented films at the theatre and operate an adult bookstore at the site. On the day the plaintiff obtained a privilege license to operate an adult bookstore, the city council convened a special meeting and enacted an emergency zoning ordinance that prohibited, within 100 yards of a residential area, the exhibition and sale of any film in which certain specified acts were depicted. *Id.* The plaintiff's theatre was located within 100 yards of a residential area, and the plaintiff challenged the constitutionality of the ordinance on First Amendment grounds. *Id.* In holding the ordinance unconstitutional, the court stated:

> Section 5 of the North Little Rock Ordinance, in part, states:
>
> > The City Council has found and determined that the prohibition of certain sexually explicit films in specific areas of the City is immediately necessary and desirable to insure and safeguard the proper development of young people and adults alike within the City of North Little Rock. . . .
>
> This "finding" is little more than a statement that the City Council thinks a certain kind of protected speech is morally objectionable. Such a purpose, however defensible on moral grounds, cannot, under the First Amendment, be the basis for restricting protected speech.

*Id.* at 661 n. 6. The court relied on a city alderman's testimony that he hoped the ordinance would keep the theatre from opening, and stressed that the city council enacted the ordinance "only after learning of the imminent opening of the city's first 'adult' movie theatre." *Id.* at 661. The court concluded:

> In sum, the North Little Rock ordinance is clearly a content-based regulation of protected speech. This is not an obscenity case, and the City does not claim that the ordinance is limited to obscenity. The City's power to prosecute Avalon if it exhibits an obscene film is not questioned, either by the plaintiff or by this Court. This ordinance would reach a two-hour film, for example, in which one of the enumerated acts or parts of the body is depicted for a few seconds, no matter how much artistic merit or intellectual content the film as a whole might have. Such an enactment cannot, under traditional First Amendment doctrine, be justified as a reasonable regulation of the time, place, and manner of lawful speech. The Supreme Court has quite recently repeated the rule that a "major criterion for a valid time, place, and manner restriction is that the restriction 'may not be based upon either the content or subject matter of the speech.' " *Heffron v. International Soc'y for Krishna Consciousness*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), quoting *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980).

*Id.* at 663 (footnotes omitted).

[¶ 12] *Avalon* is distinguishable from this case. The court noted in *Avalon*, 667 F.2d at 661, that the city council enacted the zoning ordinance "only after learning of the imminent opening of the city's first 'adult' movie theatre." The ordinance was hastily enacted and contained only a "brief statement" of the reasons for enacting the legislation. *Id.* The court further noted that the council's "actions apparently were not based on any studies by social scientists, or on a demonstrated past history of 'adult' theatres' causing neighborhood deterioration," which was a critical factor relied upon by the Supreme Court in upholding the challenged ordinances in *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). *Avalon*, at 661. Here, Mandan had adult entertainment establishments for decades before enacting the challenged ordinances. The ordinances were enacted only after public hearings and the enumerated legislative findings of the reasons for enacting the ordinances are extensive and specific.

[¶ 13] Moreover, *Avalon* was decided before the United States Supreme Court issued its decision in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). In *Renton*, at 43, 106 S.Ct. 925 the city enacted a zoning ordinance that prohibited adult motion picture theatres from locating within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park, or school. In holding there was no First Amendment violation, the Supreme Court stated that the city was entitled to rely on the experience of other cities in enacting its adult theatre zoning ordinance: "The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Id.* at 51–52, 106 S.Ct. 925. The Supreme Court also rejected the Ninth Circuit Court of Appeals' view that the ordinance would be invalid if a motivating factor in its enactment was to restrict

the exercise of First Amendment rights, "no matter how small a part this motivating factor may have played in the City Council's decision." *Id.* at 47, 106 S.Ct. 925. The Supreme Court said:

> This view of the law was rejected in *United States v. O'Brien,* 391 U.S. at 382–386, 88 S.Ct. 1673 the very case that the Court of Appeals said it was applying:
>
>> "It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive. . . .
>>
>> . . . .
>>
>> ". . . What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." *Id.* at 383–384, 88 S.Ct. 1673.

The District Court's finding as to "predominate" intent, left undisturbed by the Court of Appeals, is more than adequate to establish that the city's pursuit of its zoning interests here was unrelated to the suppression of free expression. The ordinance by its terms is designed to prevent crime, protect the city's retail trade, maintain property values, and generally "protec[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life," not to suppress the expression of unpopular views. See App. To Juris. Statement 90a. As JUSTICE POWELL observed in *American Mini Theatres,* "[i]f [the city] had been concerned with restricting the message purveyed by adult theaters, it would have tried to close them or restrict their number rather than circumscribe their choice as to location." 427 U.S. at 82, n. 4, 96 S.Ct. 2440.

*Id.* at 47–48, 106 S.Ct. 925. The Court held that the city's ordinance was a valid content-neutral time, place, and manner regulation:

> In sum, we find that the Renton ordinance represents a valid governmental response to the "admittedly serious problems" created by adult theaters. Renton has not used "the power to zone as a pretext for suppressing expression," but rather has sought to make some areas available for adult theaters and their patrons, while at the same time preserving the quality of life in the community at large by preventing those theaters from locating in other areas. This, after all, is the essence of zoning. Here, as in *American Mini Theatres,* the city has enacted a zoning ordinance that meets these goals while also satisfying the dictates of the First Amendment.

*Id.* at 54–55, 106 S.Ct. 925 (internal citations and footnote omitted). Under the standards announced in *Renton,* numerous zoning restrictions on adult businesses have withstood First Amendment challenges. *See, e.g.,* C. Crocca, Annot., *Validity of Ordinances Restricting Location of "Adult Entertainment" or Sex-Oriented Businesses,* 10 A.L.R.5th 538 (1993), and cases collected therein.

[¶ 14] McCrothers and Berger rely on an excerpt of a discussion between Mandan City Commission members after a public hearing concerning their displeasure with the prospect of another adult business establishment locating "in the heart of downtown" as evidence that the ordinances are not content-neutral. According to McCrothers and Berger, this exchange "reveals that the City's motives in enacting these Ordinances were impermissibly linked to the suppression of expressive conduct." McCrothers and Berger also point to statements made by persons during the public hearings evidencing their

"moral humbuggery" and the Commission's improper motivation for enacting the ordinances. However, Ordinance No. 963 contains the following findings:

1. Purpose. It is the purpose of this ordinance to regulate adult entertainment establishments in order to promote the health, safety, and general welfare of the citizens of the City, and to establish reasonable and uniform regulations to prevent the deleterious secondary effects and concentrations of adult entertainment establishments within the City. The provisions of this ordinance have neither the purpose nor effect of imposing a limitation or restriction on the content or reasonable access to any communicative materials, including sexually oriented materials. Similarly, it is neither the intent nor effect of this ordinance to restrict or deny access by adults to sexually oriented materials protected by the First Amendment, or to deny access by the distributors and exhibitors of sexually oriented entertainment to their intended market. Neither is it the intent nor effect of this ordinance to condone or legitimize the distribution of obscene material.

2. Findings. Based on evidence concerning the adverse secondary effects of adult uses presented in hearings and in reports made available to the Board, and on findings incorporated in the cases of *City of Erie v. Pap's A.M.,* 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000); *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Young v. American Mini Theatres,* 427 U.S. 50, 96 S.Ct. 2440 (1976); *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991); *Thomas v. Chicago Park District,* 534 U.S. 316, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002); *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972)[;] *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002); and other cases; and reports of secondary effects occurring in and around adult entertainment establishments, including, but not limited to, Phoenix, Arizona; Minneapolis, Minnesota; Houston, Texas; Indianapolis, Indiana; Amarillo, Texas; Garden Grove, California; Los Angeles, California; Whittier, California; Austin, Texas; Seattle, Washington; Oklahoma County, Oklahoma; Cleveland, Ohio; Dallas, Texas; Tucson, Arizona; St. Croix County, Wisconsin; Bellevue, Washington; Newport News, Virginia; New York, New York; ... and from summaries of several of the foregoing secondary effects reports; and also on findings from the Report of the Attorney General's Working Group on the Regulation of Sexually Oriented Businesses (June 6, 1989, State of Minnesota), the Board finds:

1. The nature of adult establishments is such that they are recognized as having adverse secondary characteristics, particularly when they are accessible to minors and located near residential property or related residential uses, such as schools, day care centers, libraries, churches or parks.

2. The concentration of adult establishments has an adverse effect upon

the use and enjoyment of adjacent areas.

3. The nature of adult establishments requires that they not be allowed within certain zoning districts, or within minimum distances from each other or residential and related residential uses.

4. Regulation of adult establishments is necessary to ensure that the adverse secondary effects would not contribute to or enhance criminal activity in the area of residential uses or contribute to the blighting or downgrading of the surrounding property and lessening of its value.

5. The Mandan Planning & Zoning Commission, following notice thereof, held a public hearing on the proposed ordinance and has considered testimony, written comments, and material from the public by and through said hearing, and has recommended approval of the zoning changes for adult uses.

6. This ordinance is consistent with the *Downtown Mandan and Memorial Highway Redevelopment Plan,* purposes, goals, and policies:

(1) To establish downtown Mandan as a progressive pedestrian oriented district using Smart Growth initiatives that are responsive to local vernacular design, community values, and adaptable to technological changes.

(2) To improve image and character through investment, beautification, and heritage.

(3) To encourage new mixed-use development (including commercial, residential and educational) to maintain a lively, attractive, and safe place to live, work, and visit.

[¶ 15] Ordinance No. 964 contains additional detailed findings:

A. Adult Entertainment Establishments lend themselves to ancillary unlawful and unhealthy activities that cause deleterious secondary effects in the establishments and in the areas surrounding them. This ordinance is designed to make the owners and operators of these establishments responsible, within constitutional boundaries, for the activities that occur on their premises.

B. Certain employees of unregulated adult entertainment establishments defined in this ordinance as adult cabarets engage in higher incidence of certain types of illicit sexual behavior than employees of other establishments.

C. Sexual acts, including masturbation and oral and anal sex, occur at unregulated adult entertainment establishments, especially those which provide private or semi-private booths or cubicles for viewing films or videos or live sexually oriented shows.

D. Offering and providing such unregulated space encourages unsanitary activities, which create unhealthy conditions.

E. Persons frequent certain adult cabarets, adult arcades, and other adult entertainment establishments for the purpose of engaging in illicit sexual activities within the premises of such adult entertainment establishments, or for the purpose of purchasing or selling illicit drugs.

F. Numerous communicable diseases may be spread by activities occurring in adult entertainment establishments.

G. According to research from the Kaiser Family Foundation, an estimated 650,000 to 900,000 Americans are

infected with HIV. The number of new HIV infections occurring each year is now about 41,000. Men and women of all races are most likely to be infected by sexual conduct.

H. The Centers for Disease Control and Prevention estimates that as many as 1 in 3 people with HIV do not know they are infected.

I. The number of cases of early (less than one year) syphilis in the United States reported annually has risen, with 33,613 cases reported in 1982 and 45,200 through November of 1990.

J. The number of cases of gonorrhea in the United States reported annually remains at a high level, with over one-half million cases being reported in 1990.

K. The surgeon general of the United States in his report of October 22, 1986, has advised the American public that AIDS and HIV infection may be transmitted through sexual contact, intravenous drug abuse, exposure to infected blood and blood components, and from an infected mother to her newborn.

L. According to the best scientific evidence, AIDS and HIV infection, as well as syphilis and gonorrhea, are principally transmitted by sexual acts.

M. Sanitary conditions in some adult entertainment establishments are unhealthy, in part, because the activities conducted there are unhealthy, and, in part, because of the unregulated nature of the activities and the failure of the owners and the operators of the facilities to self-regulate those activities and maintain those facilities.

N. Numerous studies and reports have determined that semen is found in the areas of adult entertainment establishments where persons view "adult" oriented films and live sexual shows.

O. The findings noted in the paragraphs A through N raise substantial governmental concerns.

P. Adult Entertainment Establishments have operational characteristics that should be reasonably regulated in order to protect those substantial governmental concerns.

Q. A reasonable licensing procedure is an appropriate mechanism to place the burden of that reasonable regulation on the owners and the operators of the adult entertainment establishments. Further, such a licensing procedure will give an incentive to the operators to see that the adult entertainment establishment is run in a manner consistent with the health, safety and welfare of its patrons and employees, as well as the citizens of the City. It is appropriate to require reasonable assurances that the licensee is the actual operator of the adult entertainment establishment, in ultimate possession and control of the premises and activities occurring therein.

R. Removal of doors on adult booths, cubicles, or individual viewing areas and requiring sufficient lighting on premises with adult booths advances a substantial governmental interest in curbing the illegal and unsanitary sexual activity occurring in adult establishments.

S. Requiring licensees of adult establishments. to keep information regarding current and certain past employees will help reduce the incidence of certain types of criminal behavior by facilitating the identifi-

cation of potential witnesses or suspects and by preventing minors from working in such establishments.

T. The disclosure of certain information by those persons ultimately responsible for the day-to-day operation and maintenance of the adult establishment, where such information is substantially related to significant governmental interest in the operation of such uses, will aid in preventing the spread of sexually transmitted diseases.

U. In the prevention of the spread of communicable diseases, it is desirable to obtain a limited amount of information regarding certain employees who may engage in the conduct which this ordinance is designed to prevent, or who are likely to be witnesses to such conduct.

V. The fact that an applicant for an adult use license has been convicted of a sexually related crime leads to the rational assumption that the applicant may engage in that conduct in contravention of this ordinance.

W. The barring of such individuals from the management of adult uses for a period of years serves as a deterrent to, and prevents conduct which leads to, the transmission of sexually transmitted diseases.

X. The general welfare, health, morals, and safety of the citizens of this City will be promoted by the enactment of this ordinance.

[¶ 16] We recognize that the predominate intent of regulations challenged on First Amendment grounds is generally a finding of fact, *see Renton*, 475 U.S. at 48, 106 S.Ct. 925, but McCrothers and Berger concede there are no disputed issues of material fact to preclude summary judgment. Although motivating factors for the enactment of the ordinances may have included moral aversion to adult establishments and the prevention of another adult establishment locating on Mandan's Main Street, the City Commission minutes and the Commissioners' subsequent findings do not reflect that these were the primary factors. In view of the Commission's extensive and specific findings and its previous allowance of exotic dancing on Main Street, we are satisfied that the predominating factor in enacting the zoning ordinances was the negative secondary effects of the adult establishments on Main Street and their increasing number, rather than an intention to restrict the First Amendment rights of McCrothers and Berger. *See, e.g., Stringfellow's of New York, Ltd. v. City of New York*, 91 N.Y.2d 382, 671 N.Y.S.2d 406, 694 N.E.2d 407, 416 (1998) ("courts will not 'invalidate a municipal zoning ordinance simply because one or more legislators sought to suppress protected expression.... [I]t is the motive of the Legislature, not individual legislators, that is controlling'") (internal citations omitted). We conclude that the ordinances are content-neutral time, place, and manner regulations, and that strict scrutiny analysis is not required.

### B

[¶ 17] In *Olson*, 305 N.W.2d at 823 n. 1, this Court upheld the constitutionality of West Fargo's cabaret ordinance, which similarly banned "topless and go-go dancing" in licensed liquor establishments. *Olson*, at 824–27, relied extensively on the United States Supreme Court's decision in *California v. LaRue*, 409 U.S. 109, 118–19, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), which held that the conclusion embodied in a statute prohibiting nude dancing where liquor was sold "was not an irrational one," and "[g]iven the added presumption in favor of the validity of the

state regulation in this area that the Twenty-first Amendment requires," the challenged regulations passed constitutional muster. However, in *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 515–16, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), the Supreme Court disavowed *LaRue's* reliance on the Twenty-first Amendment, but otherwise upheld the precedential value of the case because "the Court's analysis in *LaRue* would have led to precisely the same result if it had placed no reliance on the Twenty-first Amendment." Since then, courts have "struggled in deciding whether adult entertainment liquor regulations should fall under the analytical framework of zoning regulations or public indecency regulations" and have devised various tests to analyze their constitutionality. *Giovani Carandola, Ltd. v. Fox,* 396 F.Supp.2d 630, 638 (M.D.N.C.2005), *aff'd in part, rev'd in part, and vacated in part on other grounds,* 470 F.3d 1074 (4th Cir. 2006).

 [¶ 18] The Seventh Circuit Court of Appeals' test, based upon *O'Brien* and its progeny, is inclusive, logical, and persuasive, and we apply it to analyze the constitutionality of an ordinance that restricts the combination of alcohol and nude or semi-nude dancing:

> [W]e conclude that a liquor regulation prohibiting the sale or consumption of alcohol on the premises of adult entertainment establishments is constitutional if: (1) the State is regulating pursuant to a legitimate governmental power; (2) the regulation does not completely prohibit adult entertainment; (3) the regulation is aimed not at the suppression of expression, but rather at combating the negative secondary effects caused by adult entertainment establishments; and (4) the regulation is designed to serve a substantial government interest, narrowly tailored, and reasonable alterna-

tive avenues of communication remain available; *or,* alternatively, the regulation furthers an important or substantial government interest and the restriction on expressive conduct is no greater than is essential in furtherance of that interest.

*Ben's Bar, Inc. v. Village of Somerset,* 316 F.3d 702, 722 (7th Cir.2003) (internal citations and footnote omitted); *compare State v. Niska,* 380 N.W.2d 646, 649 (N.D. 1986) (under *O'Brien,* government regulation which only incidentally restricts speech is valid if "[t]he regulation is within the constitutional power of the state"; "[i]t furthers an important or substantial governmental interest"; "[t]he governmental interest is unrelated to the suppression of free expression"; "[t]he incidental restriction on alleged first amendment freedoms is no greater than is essential to the furtherance of that interest").

[¶ 19] McCrothers and Berger do not dispute that the ordinances satisfy the first prong of the test. The United States Supreme Court observed in *44 Liquormart, Inc.,* 517 U.S. at 515, 116 S.Ct. 1495 that, "[e]ntirely apart from the Twenty-first Amendment, the State has ample power to prohibit the sale of alcoholic beverages in inappropriate locations" through its inherent police powers. The Supreme Court, as well as this Court, have long recognized the power of the State and the cities within it to regulate circumstances involving the public welfare, including the use of "land-use regulation in an effort to maintain order with respect to the quality of life as cities grow." *City of Minot v. Central Ave. News, Inc.,* 308 N.W.2d 851, 858 (N.D.1981); *see also Euclid v. Ambler Realty Co.,* 272 U.S. 365, 388, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Olson,* 305 N.W.2d at 823; N.D.C.C. § 40–05–01(29) (municipalities have the power to "regulate the use and to regulate and license the sale of

alcoholic beverages"); N.D.C.C. § 40–47–01 (cities may zone "[f]or the purpose of promoting health, safety, morals, or the general welfare of the community"); N.D.C.C. § 5–02–09 (a local governing body by ordinance "may regulate or restrict the operation of [alcoholic beverage] licensees, including ... regulation of dancing or various forms of entertainment on the premises"). Mandan is regulating under a legitimate governmental power.

■ [¶ 20] The second prong of the test is satisfied because the challenged Mandan ordinances do not completely eliminate adult entertainment. Adult entertainment is permitted in licensed establishments that do not serve alcohol and are located within particular-zoned areas within the city. McCrothers and Berger argue that the ordinances have effectively eliminated exotic dancing in Mandan, not because the city has failed to allow businesses offering exotic dancing sufficient alternative amounts of property within which to locate, but because no businesses have chosen to offer exotic dancing in those zoned areas since the ordinances have been in effect. The absence of establishments offering exotic dancing under the circumstances permitted by the ordinances could be the result of numerous business-related factors, but we do not view this fact as constitutionally significant. As the court stated in *Colacurcio v. City of Kent*, 163 F.3d 545, 557 (9th Cir. 1998):

> The test for determining whether an adult business' First Amendment rights are threatened is whether [ ] the government has "effectively den[ied]" the business "a reasonable opportunity to open and operate" within the city or area in question. *Renton*, 475 U.S. at 54, 106 S.Ct. 925, 89 L.Ed.2d 29. We elaborated on this test in *Spokane Arcade, Inc. v. City of Spokane*, 75 F.3d 663 (9th

Cir.1996). The test is whether a business *could* operate under the regulations at issue, not whether a particular business will be able to compete successfully within the market. *Id.* at 666. "[I]n the absence of any absolute bar to the market ... it is irrelevant whether '[a regulation] will result in lost profits, higher overhead costs, or even prove to be commercially unfeasible for an adult business'". *Id.* (quoting *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1531 (9th Cir.1993)).

*See also Lakeland Lounge of Jackson, Inc. v. City of Jackson*, 973 F.2d 1255, 1260 (5th Cir.1992) ("The fact that these locations do not seem particularly desirable for economic reasons does not matter"); *Function Junction, Inc. v. City of Daytona Beach*, 705 F.Supp. 544, 552 (M.D.Fla. 1987) (all the First Amendment requires " 'is that "speech," "expression," and "ideas" be allowed a physically adequate forum' ") (internal citation omitted). The Mandan ordinances allow exotic dancing in various zoned areas in the city, albeit not in establishments that serve alcoholic beverages. The First Amendment does not entitle an alcoholic beverage establishment, its dancers, or its patrons, to have alcohol available during a presentation of nude or semi-nude dancing. *See, e.g., Ben's Bar, Inc.*, 316 F.3d at 726; *Gary v. City of Warner Robins*, 311 F.3d 1334, 1340 (11th Cir.2002); *Sammy's of Mobile, Ltd. v. City of Mobile*, 140 F.3d 993, 999 (11th Cir.1998); *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd. of California*, 99 Cal. App.4th 880, 121 Cal.Rptr.2d 729, 741 (2002); *cf. Olson*, 305 N.W.2d 821.

[¶ 21] We have already addressed the third prong of the test and concluded that the ordinances are aimed at combating the negative secondary effects caused by adult entertainment establishments rather than

at the suppression of expression. The fourth prong requires an examination of whether the ordinances are designed to serve a substantial government interest, and whether the restriction on expressive conduct is no greater than is essential in furtherance of that interest.

[¶ 22] The Supreme Court has recognized that a city's interest in curbing the secondary effects associated with adult entertainment establishments is substantial. *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 435, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) ("reducing crime is a substantial government interest"); *Renton*, 475 U.S. at 50, 106 S.Ct. 925 ("Exactly the same vital governmental interests are at stake here"); *American Mini Theatres*, 427 U.S. at 71, 96 S.Ct. 2440 ("the city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect"). McCrothers and Berger do not assert that the city's interest is insubstantial, but essentially argue that the city has failed to show that the ordinances actually serve that government interest. *See Renton*, 475 U.S. at 51–52, 106 S.Ct. 925 (city need not "conduct new studies or produce evidence independent of that already generated by other cities, *so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses* ") (emphasis added).

[¶ 23] In *Alameda Books, Inc.*, 535 U.S. at 433, 122 S.Ct. 1728, the Supreme Court granted certiorari "to clarify the standard for determining whether an ordinance serves a substantial government interest under *Renton*." The plurality in *Alameda Books, Inc.*, at 438, 122 S.Ct. 1728 refused to "require that the city provide evidence that not only supports the claim that its ordinance serves an important government interest, but also does not

provide support for any other approach to serve that interest." The Court said:

> In *Renton*, we specifically refused to set such a high bar for municipalities that want to address merely the secondary effects of protected speech. We held that a municipality may rely on any evidence that is "reasonably believed to be relevant" for demonstrating a connection between speech and a substantial, independent government interest. 475 U.S., at 51–52, 106 S.Ct. 925; see also, *e.g.*, *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 584, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (SOUTER, J., concurring in judgment) (permitting municipality to use evidence that adult theaters are correlated with harmful secondary effects to support its claim that nude dancing is likely to produce the same effects). This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton*. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance. See, *e.g.*, *Erie v. Pap's A.M.*, 529 U.S. 277, 298, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion).

*Id.* at 438–39, 122 S.Ct. 1728.

[¶ 24] McCrothers and Berger rely on numerous comments made by proponents of the ordinances during the public hearings for the proposition that the ordi-

nances do not actually serve a government interest. For example, a concern was expressed that "[p]ersons who live in apartments in the downtown area, or in single family residences nearby, are bothered by the loud noise of the strip clubs and are afraid to walk on the sidewalks because the customers from the bars are bar hopping in groups." McCrothers and Berger contend this statement is "specious" because there are a number of bars and clubs offering live music in downtown Mandan and eliminating exotic dancing will not discourage bar hopping. Other comments were that "[a] testimonial by a former strip club dancer ... stated that dancing was just a front for prostitution," and that "many of the dancers employed by the bars come from Chicago, Milwaukee, and Minneapolis." According to McCrothers and Berger, these comments are irrelevant because their businesses were not "strip clubs" and "there is no way to discern where this person gleaned his or her information," and because the city should not "revil[e] those who seek gainful employment simply because they come from urban areas." Other comments reflected concern that the adult establishments gave an adverse image of Mandan to visitors and the city "needs to require current property owners to clean up, paint, repair and maintain their property on Main Street." This comment is irrelevant, according to McCrothers and Berger, because general concerns of disrepair should be levied "against the whole of downtown." McCrothers and Berger describe as "fearmongering" the police chief's "background checks on dancers who had performed in Mandan in the last several months, which showed that 38% of the dancers had convictions for prostitution, drug offenses, fraud, assault, and other crimes."

[¶ 25] We do not believe the complaints leveled by McCrothers and Berger cast direct doubt on the city's rationale for enacting the ordinances. They constitute mere differences of opinion on whether the city's concerns will be addressed by enactment of the ordinances. A "city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *American Mini Theatres*, 427 U.S. at 71, 96 S.Ct. 2440.

[¶ 26] A plaintiff may also furnish evidence that disputes the city's factual findings to show that a challenged ordinance does not serve a substantial government interest. *See Alameda Books, Inc.*, 535 U.S. at 439, 122 S.Ct. 1728. McCrothers and Berger rely upon an article criticizing the methodology of many of the secondary effects studies conducted by other communities that were mentioned and incorporated by the city of Mandan in its findings. *See* B. Paul, D. Linz, B. Shafer, *Government Regulation of "Adult" Businesses Through Zoning and Anti–Nudity Ordinances: Debunking the Legal Myth of Negative Secondary Effects*, 6 Comm. L. & Pol. 355 (2001). We agree with the courts that have refused invitations to overturn ordinances based on the findings in this article, because "[g]eneral commentary criticizing adverse secondary effect studies is not enough to cast 'direct doubt' on the city's rationale for the ordinance." *City of Elko v. Abed*, 677 N.W.2d 455, 465 (Minn. App.2004); *see also SOB, Inc. v. County of Benton*, 317 F.3d 856, 863–64 (8th Cir. 2003). Although the arguments of McCrothers and Berger may, at best, raise factual issues, we again note they do not contend that summary judgment is inappropriate. We conclude the Mandan ordinances serve a substantial government interest.

[¶ 27] McCrothers and Berger argue the ordinances are facially overbroad, and consequently, the restriction on expressive conduct is not narrowly tailored

and is greater than is essential to further the government interest. "Overly broad statutes are those that restrict constitutionally protected expression as well as expression that is unprotected." *Kraimer v. City of Schofield,* 342 F.Supp.2d 807, 814 (W.D.Wis.2004). "State action can be challenged on overbreadth grounds for its potential to chill or infringe free speech even though the challenger's rights may not have been violated under the circumstances." *Bolinske v. North Dakota State Fair Ass'n,* 522 N.W.2d 426, 429–30 (N.D. 1994); *see also State v. Tibor,* 373 N.W.2d 877, 881 (N.D.1985). The overbreadth "doctrine permits 'an individual whose own speech or conduct may be prohibited ... to challenge a statute on its face because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so.'" *SOB, Inc.,* 317 F.3d at 864 (quoting *Ways v. City of Lincoln,* 274 F.3d 514, 518 (8th Cir.2001)). In *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), the Supreme Court said invalidation of legislation under the overbreadth doctrine is "manifestly, strong medicine" which should be used "sparingly and only as a last resort," and that "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *See also Osborne v. Ohio,* 495 U.S. 103, 112, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990); *compare United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985) (validity of time, place, and manner regulations "does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests," nor are they "invalid simply because there is some imaginable alternative that might be less burdensome on speech").

[¶ 28] McCrothers and Berger argue Ordinance No. 961 is overbroad because it prohibits "more than just exotic dancing" and would "outlaw the performances of cheerleaders at sporting events where alcohol is served" as well as "the performance of a dance troupe." According to McCrothers and Berger, Ordinance No. 961 also regulates too many businesses by including restaurants and hotels where "[t]ime-honored customs, such as wedding reception garter auctions" and "[b]achelor and bachelorette parties" would be forbidden. We are not persuaded by this argument. Ordinance No. 961 prohibits "live performances" in alcoholic beverage licensed premises, and "live performances" are defined as "any person who *for consideration, monetary or otherwise,* performs in person." Mandan Code of Ordinances § 12–01–18(1)(b) (emphasis added). As this Court stated in rejecting an overbreadth argument against similar ordinances in *Olson,* 305 N.W.2d at 826, "the prohibition under attack is confined strictly to the four walls of the barroom and focuses only on persons dancing for consideration." We conclude these features of the ordinances are not constitutionally overbroad.

[¶ 29] McCrothers and Berger also challenge as overbroad the disclosure requirements contained in the ordinances. Ordinance No. 964 created Mandan Code of Ordinances § 13–02.1–04(1)(A)(5), which requires applications for an adult cabaret license to include:

For the applicant and all applicant control persons, any and all criminal convictions or forfeitures within five (5) years immediately preceding the date of the application, other than parking offenses or minor traffic infractions including the dates of conviction, nature of the crime, name and location of court and disposition.

[¶ 30] In *City of Minot v. Central Ave. News, Inc.*, 308 N.W.2d 851, 863 (N.D. 1981), this Court addressed the constitutionality of an ordinance requiring owners and managers of adult entertainment centers to furnish to the chief of police "their fingerprints and 'prior criminal records, if any.' " In holding this provision was constitutionally overbroad, we said:

> Arguably, law-enforcement agencies would be aided in their surveillance and enforcement activities regarding adult entertainment centers if they knew, for instance, which owners or managers of such businesses had been convicted for crimes related to obscenity. However, there clearly are some types of criminal convictions which in no way can be associated with the operation of a business in general or to adult entertainment centers in particular. In this respect we believe that the requirement of disclosing prior criminal records goes too far. A more narrowly drawn criminal-record-disclosure requirement focusing on particular crimes which are reasonably related to the governmental interest involved herein might survive constitutional scrutiny.

*Id.*

[¶ 31] Although the disclosure requirement in the Mandan ordinance contains some of the same features as the *City of Minot* ordinance, we believe the Mandan ordinance is distinguishable. Unlike the Minot ordinance, the disclosure of criminal records required by the Mandan ordinance is limited to a period of five years immediately preceding the date of application. Furthermore, the Commission's findings in this case are much more extensive and specific than those accompanying the Minot ordinance. *See City of Minot,* 308 N.W.2d at 855 n. 1. The Commission's detailed findings on the adverse secondary effects of adult establishments support a broad disclosure requirement beyond obscenity-related criminal offenses. Knowledge of an applicant's conviction of crimes not directly related to obscenity would be relevant in the City's attempt to combat those documented adverse secondary effects. Moreover, since this Court issued its decision in *City of Minot* more than 25 years ago, criminal background checks have become very common. *See, e.g.,* N.D.C.C. §§ 4–41–02(1); 5–02–02(8); 12–60–24(1); 15.1–13–14; 15.1–13–23; 43–30–02.1; 50–11–02.4; 50–11–06.8; 50–11.3–01; 50–12–03.2; 54–12–20(6). It may be arguable that the constitutional overbreadth holding in *City of Minot* is no longer viable, but we need not decide the issue. We conclude that the disclosure requirement in the Mandan ordinance is not constitutionally overbroad, and that the ordinances, as a whole, are narrowly tailored and do not restrict expressive conduct any greater than is essential in furtherance of the government interest.

[¶ 32] We conclude the First Amendment free speech rights of McCrothers and Berger have not been violated by Mandan Ordinances Nos. 961, 963, and 964.

## IV

[¶ 33] McCrothers and Berger argue that they are entitled to compensation for the property interests they held in downtown Mandan "which were unconstitutionally taken" after the city passed the ordinances. To support their claim, McCrothers submitted evidence that the Tree City Bar's revenues decreased from $66,809 for a four-month period before the ordinances became effective to $21,066 for the same four-month period after the ordinances became effective, and Berger submitted evidence that the Silver Dollar Bar's revenues decreased from $142,080 to $68,872 during the same time periods.

[¶ 34] Whether there has been a taking of private property for public use is a question of law which is fully reviewable on appeal. *Wild Rice River Estates, Inc. v. City of Fargo,* 2005 ND 193, ¶ 10, 705 N.W.2d 850; *Braunagel v. City of Devils Lake,* 2001 ND 118, ¶ 16, 629 N.W.2d 567. Because the Mandan ordinances did not constitute a physical taking of property or deprive the bar owners of all economically beneficial use of their property, this takings claim is governed by the standards set forth in *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). *See Wild Rice River Estates, Inc.,* at ¶ 13.

> These standards are "designed to allow 'careful examination and weighing of all the relevant circumstances.'" The primary *Penn Central* factors are "'[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations,'" and the "'character of the governmental action'—for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.'" The *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests.

*Id.* (internal citations omitted).

[¶ 35] The Mandan ordinances advance not only a legitimate government interest, but a substantial interest under the First Amendment, and affect property interests to promote the common good. Considering the lengthy history of zoning restrictions on adult entertainment establishments in this State and others, any investment-backed expectations held by McCrothers and Berger were neither legitimate nor reasonable. Furthermore, the economic impact of the ordinances on McCrothers and Berger is not appreciable in a constitutional sense. *See Colacurcio,* 163 F.3d at 557. McCrothers and Berger cannot claim that the ordinances have deprived them of all economically viable use of their property. The ordinances merely prohibit McCrothers and Berger from offering exotic dancing in an establishment that serves alcohol. They may continue to operate bars in their present location, relocate and offer adult entertainment without an alcoholic beverage license, or convert their businesses to unregulated enterprises. As we have concluded, they have no constitutional right to offer exotic dancing in a bar. The ordinances have not caused actual interference with their right to operate businesses. We conclude, like the other courts which have addressed the question under similar circumstances, that McCrothers and Berger did not suffer an unconstitutional taking of property without just compensation. *See, e.g., SDJ, Inc. v. City of Houston,* 837 F.2d 1268, 1278 (5th Cir.1988); *P.M. Realty & Invs., Inc. v. City of Tampa,* 779 So.2d 404, 408–09 (Fla.App.2000); *Dandy Co., Inc. v. Civil City of South Bend, County–City Complex,* 401 N.E.2d 1380, 1386 (Ind.App. 1980); *DiRaimo v. City of Providence,* 714 A.2d 554, 564 (R.I.1998); *Greenville County v. Kenwood Enters., Inc.,* 353 S.C. 157, 577 S.E.2d 428, 437–38 (2003), *overruled on other grounds, Byrd v. City of Hartsville,* 365 S.C. 650, 620 S.E.2d 76, 81 n. 11 (2005); *MJR's Fare of Dallas, Inc. v. City of Dallas,* 792 S.W.2d 569, 574–75 (Tex.App.1990); *Lindsay v. Papageorgiou,* 751 S.W.2d 544, 550–51 (Tex. App.1988).

V

[¶ 36] McCrothers and Berger have attempted to challenge the Mandan ordi-

nances under the free speech provision of the state constitution, *see* N.D. Const. art. I, § 4, and to assert a takings claim under the state constitution. *See* N.D. Const. art. I, § 16. McCrothers and Berger have not marshaled any arguments explaining why the results we have reached under the federal constitution are not warranted under the provisions of the state constitution. We therefore decline to address the state constitutional issues. *See, e.g., State v. Parizek*, 2004 ND 78, ¶ 24, 678 N.W.2d 154; *City of Mandan v. Fern*, 501 N.W.2d 739, 744 n. 3 (N.D.1993); *Lund v. North Dakota State Highway Dep't*, 403 N.W.2d 25, 29 n. 6 (N.D.1987).

## VI

[¶ 37] The summary judgment is affirmed.

[¶ 38] DALE V. SANDSTROM, DANIEL J. CROTHERS, MARY MUEHLEN MARING, and CAROL RONNING KAPSNER, JJ., concur.